[Civil No. 3788. Filed February 28, 1938.]

[76 Pac. (2d) 757.]

STATE OF ARIZONA, JOHN L. SULLIVAN, as Attorney General of the State of Arizona, and HARRY JOHNSON as County Attorney of Maricopa County, Arizona, Appellants, v. Dr. JAMES LORKIN BORAH, Appellee.

Mr. John L. Sullivan, former Attorney General, Mr. Joe Conway, Attorney General, Mr. Earl Anderson, Assistant Attorney General, Mr. Harry Johnson, former County Attorney, Mr. John W. Corbin, County Attorney, and Mr. Lin Orme, Jr., Assistant County Attorney, for Appellants.

Mr. Henderson Stockton, Mr. Emmett R. Feighner and Mr. Eli Gorodezky, for Appellee.

LOCKWOOD, J.—James L. Borah, hereinafter called plaintiff, brought suit in the superior court of Maricopa county against the state of Arizona and its Attorney General, and the county attorney of Maricopa county, in their official capacities, hereinafter called defendants, for a declaratory judgment, determining his rights as to certain matters relating to the practice of dentistry. Plaintiff alleged that he was duly admitted to practice dentistry within the state of Arizona upon the recommendation of the Arizona Board of Dental Examiners in the year 1915, and has ever since practiced his profession within this state; that in practice it is frequently necessary to give a patient a general anesthetic, and that he has heretofore employed

a duly licensed physician and surgeon to administer it; that he now intends to employ a registered nurse who has taken a prescribed course of anesthesia at a hospital in good standing, to administer anesthetics in the practice of dentistry, under his direction and in his immediate presence; that a question has arisen as to whether such administration by a registered nurse of the character described, under his supervision, is permitted by the laws of Arizona; and that he desired an interpretation of the law governing such a situation. Judgment was rendered to the effect that the law of Arizona did not forbid the course of conduct which he intended to follow, and the defendants have appealed.

A determination of the question involved on the appeal requires a somewhat extensive review of the law regulating the practice of medicine and dentistry within the state of Arizona. The generic definition of the word "medicine" is "the science and art dealing with the prevention, cure or alleviation of disease," and it is in such sense that the word has always been construed by the layman, when used without some limiting phrases attached thereto. Webster's New International Dictionary. In the same way, the word "physician," when used in a like manner, is generally accepted as meaning "a person skilled in the art of healing." Webster's New International Dictionary. In the early stages of the science of medicine it was, as a rule, not divided into branches, and the physician treated every variety of ills to which the human body was subject. At common law the practice of medicine was open to all who desired to follow it in any of its branches, subject only to liability for damages in a case of lack of skill on the part of the practitioner, and to the right of government to proceed by *quo warranto* to prevent incompetents from following the business. *Redmond* v. *State,* 152 Miss.

54, 118 So. 360; *Indiana State Board* v. *Davis,* 69 Ind. App. 109, 121 N. E. 142. But this right is not and never was, an absolute, unqualified, or vested right, but was always subordinate to the police power of the state in the protection of the public health. *Lambert* v. *Yellowley,* 272 U. S. 581, 47 Sup. Ct. 210, 71 L. Ed. 422, 49 A. L. R. 575. As was said in the case of *People* v. *Witte,* 315 Ill. 282, 146 N. E. 178, 180, 37 A. L. R. 672:

"The right of a citizen to practice medicine is subject to the paramount power of the state to impose such regulations, within the limitations of the Constitution, as may be required, to protect the people against ignorance, incapacity, deception or fraud in the practice of that profession."

■■ In the proper exercise of the police power, therefore, the legislature may control and regulate the practice of medicine in all of its branches, subject only to the rule that these regulations must be reasonable and bear some relation to the end or object to be attained, which is to protect the public from being mistreated or misled by incompetent or unscrupulous practitioners. *State* v. *Armstrong,* 38 Idaho 493, 225 Pac. 491, 33 A. L. R. 835. It has, therefore, for many years been the custom of the legislative authority of the different states to regulate, to a greater or less extent, the practice of medicine. Most of the original acts dealt only with the general subject and the licensing of a physician under such act usually permitted him to treat any ill to which the human body was subject, from an ingrowing toenail to Asiatic cholera, from an aching tooth to an astigmatic eye, and many of our older citizens can remember when the general practitioner, especially in the more remote country districts, did at times exercise all these, as well as many other forms of the healing art. With the development of medical science, especially in modern

times, it was realized that it was beyond the limits of the human brain to know thoroughly and completely every portion of medical science available, and physicians began to specialize in various branches of the profession. Probably the first division was between the physician proper, who specialized in the administration of drugs of various kinds, and the surgeon, who devoted his skill to operative relief. Dentistry and ophthalmology were among the next fields for specializing, and the list has now been extended almost *ad infinitum.* Legislative control of these various branches of the medical profession also began to specialize, and under the more modern medical acts, many examinations are provided which, if successfully passed, limit the applicant to the practice of some particular branch of medicine. But at all times, and no matter how the language of the acts changed, the ultimate purpose was the same, to wit, to protect the health of the public by excluding from the practice of medicine those who had not shown themselves competent therefor. In determining, therefore, whether or not a regulation of the practice of medicine in any of its branches is a reasonable one, and thus within the power of the legislature to enact, the test must always be whether or not it is reasonably necessary and appropriate for the protection of the public health.

The first codes of the territory of Arizona made no provisions for public regulation of the practice of medicine, and the various physicians of this territory followed their profession, subject only to the rules of the common law. The Code of 1901 was the first to contain an act regulating the medical profession. Title 53 of that Code is entitled "Practice of Medicine," and it divides the subject into two branches, medicine and dentistry. The definition of one who is engaged in the practice of medicine is in the following language:

"3530. (Sec. 5) Any person shall be regarded as practicing medicine who shall profess publicly to be a physician or who shall prescribe for the sick."

The term "dentistry" was not defined, and the portion of the title dealing with that subject, after providing for the examination of those wishing to practice dentistry, also said:

"3550. (Sec. 25) That nothing in this title shall be construed so as to interfere with the rights and privileges of resident physicians and surgeons in the discharge of their professional duties."

Apparently it was the opinion of the legislature that all physicians were capable of being dentists without examination, but that the reverse was not true, and one who wished to practice only dentistry must undergo a special examination therefor. The Code of 1913 recognized that medical science was progressing by leaps and bounds and that further specialization was necessary, for title 48 of that Code, which deals with "Regulation of professional pursuits," now provides for special examinations for the "practice of medicine, dentistry, optometry, embalming and pharmacy." The definition of the "practice of medicine," paragraph 4738, is extremely lengthy and attempts to cover in detail every known form of dealing with human diseases and ills, but expressly excepts from such definition the practice of "dentistry, midwifery, or pharmacy, or in the usual business of opticians." "Dentists" are defined in the title as being those who "shall attempt to or shall perform an operation of any kind upon, or treat diseases or lesions of, or correct malpositions of, the human teeth or jaws." Par. 4751. And licensed physicians are expressly authorized to engage in "extracting teeth in the practice of oral surgery or the treatment of diseases of the mouth." The Code was again revised in 1928, and chapter 58, section 2499 et seq., deals with many forms of profes-

sions and businesses besides that of the practice of medicine. The latter category has had added to the five branches thereof named in the Code of 1913 those of chiropractors and nurses, so that the legislature at that time apparently recognized seven forms of activity which were originally under the common law conceived as falling within the general practice of medicine. The definition of the practice of medicine, section 2555, contains all the elements found in the Code of 1913, although the language has been greatly simplified, and the exceptions made are, as in 1913, dentistry, midwifery, pharmacy or opticians. "Dentistry" is defined as follows:

"§ 2541. A person shall be deemed practicing dentistry who for a fee or reward shall attempt to, or perform an operation upon, or treat diseases or lesions or correct malpositions of the human teeth or jaws; except physicians or surgeons may extract teeth in the practice of oral surgery or the treatment of diseases of the mouth."

And the usual exception permitting physicians and surgeons to practice certain forms of dentistry is again included.

Nurses, for the first time, are brought under the control of the law. Certain qualifications are prescribed for what are known as "registered nurses" and a penalty fixed for anyone who assumes to be or practices as a registered nurse without securing a license as such, although the nursing of sick for hire by what are commonly called "practical nurses" so long as they do not assume to be or advertise as registered nurses is allowed. There is a special provision which authorizes the administering of anesthetics by a registered nurse, which reads as follows:

"§ 2569. *Anesthetics; when nurse may give.* A registered nurse may administer anesthetics under the direction of and in the immediate presence of a licensed physician or surgeon, provided such nurse has taken

a prescribed course of anesthesia at a hospital in good standing, or is a graduate in the science of anesthesia from some recognized school or college.''

In 1935 the act relating to the practice of dentistry was again amended, and the definition of the practice of dentistry, under chapter 24 of the Session Laws of that year, was made to read as follows:

''Sec. 3. *Who deemed to be practicing dentistry.* A person shall be deemed to be practicing dentistry who, by himself or by an agent, employee, servant, or contractor, for fee, compensation, emolument, or reward, direct or indirect, received or expected to be received by himself or another person, and, with specific reference and application to the teeth, gums, jaws, oral cavity, or tissues adjacent thereto, in living persons, shall do or propose, agree, or attempt to do, or make an examination or give an estimate of cost with intent to: (a) *Perform an operation or administer an anesthetic in connection therewith;* (b) diagnose or treat any condition, disease, or lesion; (c) take an impression; (d) correct a malposition; (e) treat a fracture; (f) remove calcareous deposits; (g) replace missing anatomy with an artificial substitute; (h) construct, make, alter, or repair an artificial substitute or restorative or corrective appliance; (i) do any other remedial, corrective, or restorative work.'' (Italics ours.) Certain exceptions were made to this, the only material one being as follows: '' (f) nor to abridge a license issued under the laws of this state relating to medicine or surgery.''

■ The specific question which is before us then is, whether a dentist, duly licensed to practice his profession in the state of Arizona, is, within the meaning of section 2569, *supra,* a ''licensed physician or surgeon,'' or whether for the purposes of said section, these words are confined to their ordinary meaning of one who is licensed to practice the medical art in general, without being limited by his license to the practice of dentistry, as defined in the act of 1935. It will be noted that by that act a dentist is, for the first

time, expressly authorized, so far as the treatment of the teeth, gums, jaws, oral cavities or tissues adjacent thereto, to "perform an operation or administer an anesthetic in connection therewith." Before the passage of this act there was grave doubt whether under the law a licensed dentist could legally administer an anesthetic himself and it was the general practice, when such a thing was necessary, to call in a regular physician to administer the anesthetic. It is claimed by plaintiff that one of the reasons for giving this power to dentists was the recognition by the legislature that such treatment was a proper and necessary adjunct to dental surgery; that all dentists who had been properly educated were, as a matter of fact, as carefully trained in the administration of anesthetics as were physicians, and that it was unfair to require them to seek the assistance of members of another branch of the profession to do something which they were equally well qualified to do themselves. We think there can be no doubt that the reason for the express inclusion, in the 1935 act, of the administration of anesthetics in the course of dental surgery as one of the things which a dentist was expected and permitted to do as a part of the regular practice of his profession, was to remove any possible question as to his right to do so. Under the definition of the statute of 1935, therefore, dentists, or, as they are sometimes called, dental surgeons, were expressly authorized by the law to administer anesthetics in all cases of dentistry which might require such practice as much as were licensed physicians and surgeons. There can be no question that if plaintiff himself, or any other licensed dentist, desired to administer an anesthetic to a patient, as part of dental practice, they would be fully within their rights under the law. Nor is this questioned. The objection which is made is that, while he may do this himself, he may not permit

a registered nurse to do it under his direction and in his immediate presence.

The cardinal question in determining the meaning of the statute is: What was the intention of the legislature? We have repeated this in numberless cases. *Hicks* v. *Krigbaum*, 13 Ariz. 237, 108 Pac. 482; *Automatic Registering Mach. Co.* v. *Pima County*, 36 Ariz. 367, 285 Pac. 1034.

In determining this question we must first look to the specific language of the law, and if this language is plain and unambiguous and on its face susceptible of but one construction, we may not go beyond it. *Automatic Registering Mach. Co.* v. *Pima County, supra; Industrial Com.* v. *Price*, 37 Ariz. 245, 292 Pac. 1099; *Palmcroft Dev. Co.* v. *Phoenix*, 46 Ariz. 200, 49 Pac. (2d) 626, 103 A. L. R. 802. If, on the other hand, the statute under consideration, either standing alone or taken in connection with other statutes *in pari materia*, is ambiguous and susceptible of two meanings, and if one of those meanings would either lead to an absurdity or render the statute unconstitutional, while the other meaning would be logical and consistent with the general policy of the law and in conformity with the provisions of the Constitution, we must necessarily adopt the latter construction, for a construction which makes a statute constitutional is to be given rather than one which would compel us to hold it unconstitutional. *Croaff* v. *Harris*, 30 Ariz. 357, 247 Pac. 126; *Hammons* v. *Waite*, 30 Ariz. 392, 247 Pac. 799; *McBride* v. *Kerby*, 32 Ariz. 515, 260 Pac. 435. If the limited meaning originally given by the legislature to the words ''physician and surgeon'' is to be applied to these words as they appear in section 2569, *supra*, plaintiff is not, within such meaning, a physician and surgeon, and, therefore, may not use a registered nurse to administer an anesthetic. But the legislature has by the act of 1935 expressly given

him the right personally to administer such treatment. Necessarily by so doing, they have determined that a licensed dentist is fully qualified to administer an anesthetic in dental operations, which means that he knows not only how but when to give it. The licensed physician and surgeon can know no more. To hold then that a qualified nurse may administer anesthetics in a dental operation under the direction of one man, when she may not under that of another who is equally qualified to direct her, would be to assume that the legislature had meant to permit one class of practitioners to do a certain thing, while prohibiting another class which is equally qualified, so far as the protection of the public health is concerned, from doing that same thing. As we have held in the case of *State* v. *Childs,* 32 Ariz. 222, 257 Pac. 366, 369, 54 A. L. R. 736, quoting approvingly from *State* v. *Donaldson,* 41 Minn. 74, 42 N. W. 781:

" 'Such a law would not go far enough to amount to a police regulation. It would be merely giving a certain class of men a monopoly of the trade. This is not within the police power of the state. This power is, no doubt, a very broad one, and, within its legitimate sphere, a very useful one. It is wholly within the discretion of the Legislature when to exercise it, and to determine what are the best means to accomplish the desired object. Courts will never assume to determine whether the law is a wise one, or whether the Legislature have adopted the best means. Yet there is a limit to this power. A law enacted in the exercise of the police power must, in fact, be a police law. If it be a law for the protection of public health, it must be a health law having some relation to public health. In this day, when so many selfish and private schemes in the way of securing monopolies and excluding competition in trade are attempted under the mask of sanitary legislation, it may be an important question whether the judiciary are concluded by the mask, or whether they may tear it aside in order to ascertain who is in it. But with this we are not now concerned.

It is, at least, settled that, if it is apparent on the face of the act that its provisions, from their very nature, cannot and will not conduce to any legitimate police purpose, it is the right as well as the duty of the court to pronounce it invalid, as in excess of legislative power and an arbitrary and unwarranted interference with the right of the citizen to pursue any lawful occupation.' "

We think that to give section 2569, *supra,* the meaning attributed to it by the Attorney General would be to give a practical monopoly of the administration of anesthetics in dentistry to licensed physicians and surgeons, and thus render it invalid as an exercise of the police power within the doctrine laid down in *State* v. *Childs, supra,* while to hold that the word "surgeon" as used in such section includes the "dental surgeon" would make it a proper and legitimate exercise of that power. Under such circumstances every rule of statutory construction requires that we give it the constitutional, rather than the unconstitutional, meaning.

We hold, therefore, that since the enactment of the act of 1935, the word "surgeon" in section 2569, *supra,* was meant by the legislature to include licensed "dental surgeons," and that registered nurses, qualified under such section, may administer anesthetics under the direction of and in the immediate presence of a licensed dental surgeon for the purpose of assisting in any of the operations which such surgeon is authorized to perform.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER, C. J., and ROSS, J., concur.